### Gnadinger v. Gnadinger.

March 11, 1949.

Dodd & Dodd for appellant.

Hughett & Hughett for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

The appeal is from that part of a divorce judgment awarding alimony. The wife appeals and the husband has cross-appealed.

The parties were married on May 30, 1942, and lived together until November 30, 1946. A child, Frank J. Gnadinger, Jr., was born to the union on February

19, 1946. Margaret Gnadinger brought an action for divorce from bed and board on December 2, 1946, on the ground of cruel and inhuman treatment, and the husband answered denying the allegations of the petition and counterclaimed on the grounds of abandonment and six months' cruel treatment. He asked for an absolute divorce. The plaintiff filed an amended petition in which she asked for an absolute divorce. A large amount of evidence was heard, and upon submission of the case the court granted the plaintiff a divorce on her petition and the defendant a divorce on his counterclaim. The plaintiff was awarded custody of the child, with right of visitation by the defendant, and she was awarded the sum of $15 a week for the support and maintenance of the child and the sum of $1,000 as alimony for herself, the defendant to have the option of paying same in a lump sum or at the rate of $50 a month. She was allowed $300 for her attorney's fees. The defendant was adjudged to be the owner of certain person-- al property and the residence which had been oc- cupied by the parties, though the title was held jointly. The plaintiff was directed to convey all of her right, title and interest in the real estate to the defendant. On this appeal the wife insists that the award of alimony in the sum of $1,000 is inadequate, and that she should have been allowed, at least, the sum of $1,500, and, in addition to the sum allowed for the maintenance of the child, should also have been allowed a weekly payment of $15. The husband insists that no divorce should have been granted to the wife and no alimony awarded to her.

The evidence shows that at the time these parties married the appellee was a civilian flight instructor for the United States Army, and was stationed in Oklahoma. He was commissioned a Second Lieutenant in the Army Air Force in February, 1943, and a First Lieutenant early in 1945. He was stationed at various army posts in Oklahoma, Texas and Mississippi until June, 1945, when he received orders to take training for overseas service. Mrs. Gnadinger then returned to Louisville and lived with her parents until she was joined by her husband upon his discharge from the army in October, the war having ended before he was sent overseas. The couple resided with appellant's parents until they purchased a home and obtained possession in December, 1945. Ap-

pellee had been employed by the Courier-Journal Company as a linotype operator prior to his army service, and upon his discharge he returned to work at his old job. Prior to May, 1947, his wages amounted to about $70 a week, but due to an increase in the hourly wage rate his wages have amounted to approximately $80 a week since then. At the time of the marriage appellee owned personal property worth about $2,700, and at the time of the divorce he owned property, including the equity in the residence, amounting to $5,000 or $6,000 Appellee worked at night. He left home about 4 p. m. and returned at 2 or 2:30 a. m. The couple lived in their new home until a few days before the birth of their baby, when they moved to the home of appellant's parents. The baby was born in a hospital February 19, 1946, and after appellant left the hospital she and her husband lived at her parents' home until March 17. They then returned to their own home and lived there until the separation on November 30, 1946. Due to complications resulting from the birth of the child, appellant was required to submit to a surgical operation in June, 1946. She was in a hospital for several days and received medical treatment at home until August 1, 1946. The record shows that this marriage was far from successful from the beginning. The parties were clearly temperamentally unsuited to each other, and neither was willing to make the concessions and adjustments necessary to a happy union. No serious trouble occurred prior to June, 1945, when appellant returned to her parents' home in Louisville to remain while her husband was preparing for foreign service, but conditions deteriorated rapidly thereafter and culminated in a physical encounter on November 30, 1946, and a final separation. Each of the parties blames the other for wrecking the marriage, and each is corroborated to some extent, mostly by the testimony of relatives. The appellant testified that from the beginning she was the dutiful wife, always discharging the obligations of the housekeeper and home builder in a manner not open to question. She gave as her reasons for leaving her husband that he became too critical of her parents, displayed a vile temper toward her, and appeared to have little or no regard for her well being. To a question "Isn't it a fact that your husband provided for you every means that he could afford to," she answered, "Except

kind treatment. We had a lovely home and everything that anybody would wish except a nice husband, that's all.'' Her principal complaint was that appellee, though a good provider, was lacking in the attentions due from a husband. On the other hand, the testimony for appellee pictures him as a sober, industrious and attentive husband who had attempted through the years to make a success of the marriage in spite of the fact that his wife did not love him and told him so. According to him, there was constant interference and domination by her parents, appellant refused to live with him as a wife, refused to discharge her duties as a housekeeper, and would not associate with his relatives. Both parties were communicants of the Roman Catholic Church, and appellee, during the summer of 1946, counseled with his parish priests in an effort to have a reconciliation effected and to find a solution to their difficulties, but the clash of personalities was too great and the efforts of the priests were without avail. The chancellor reached the conclusion that both parties were in fault and, as was done in Flood v. Flood, 302 Ky. 167, 194 S.W.2d 166, ''measured the alimony by the rule of comparative rectitude.''

The evidence is in hopeless conflict, and the chancellor is far better situated to sift out the truth than are the members of this court. In the Flood case a divorce was granted to the wife on the ground of cruel treatment, and she was awarded alimony in the sum of $1,500. The husband's estate amounted to $10,000 or $12,000, and he was gainfully employed. He appealed, and contended that the divorce should have been granted to him on his counterclaim and no alimony should have been awarded his wife. The wife prosecuted a cross-appeal, and contended her alimony should have been, at least, $3,000. What the court said in concluding its opinion affirming the judgment in that case is peculiarly applicable here: ''* * * as recently discussed in Kreidler v. Kreidler, 301 Ky. 105, 190 S.W.2d 1012, for many years in the granting of alimony the courts have considered the elements of comparative conduct and the relative responsibility of the husband and wife for the breach in the marriage tie. The conclusion of the whole matter is that, in recognition of the rule to give considerable weight to the finding of the chancellor, we cannot say that the

judgment is wrong, either in the allowance of alimony to the wife on the one hand, or in the limitation of the amount on the other.''

The judgment is affirmed on both the appeal and the cross-appeal.